IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Haliron Power, LLC,

Plaintiff,

v.

Fluor Daniel Caribbean, Inc., a subsidiary of Fluor Enterprises, Inc., Zurich American Insurance Company, Federal Insurance Company, Travelers Casualty and Surety Company, Fidelity and Deposit Company of Maryland, and, Liberty Mutual Insurance Company,

Defendant(s).

Civil Action No.: 6-18-cv-02911-TMC

**AMENDED COMPLAINT**

The Plaintiff, Haliron Power, LLC ("Haliron" or "Plaintiff") complaining of the Defendant(s) Fluor Daniel Caribbean, Inc. a subsidiary of Fluor Enterprises, Inc. (collectively "Fluor" or "Defendants") would respectfully allege and show as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Haliron is a foreign limited liability company organized and existing under the laws of the State of Arkansas with its principal place of business in Hempstead County, Arkansas. At all times herein, Haliron was conducting business in the State of South Carolina and the Territory of Puerto Rico pursuant to a contractual relationship with Fluor.

2. Haliron is a privately-owned company in the business of providing construction, repair, maintenance servicing, power distribution, and project management services related to electric utilities.

3. Upon information and belief, Defendant, Fluor Daniel Caribbean, Inc. ("FDCI") is a dissolved foreign corporation formally organized and existing under the laws of the State of

Delaware and formerly registered in the State of South Carolina. At all times herein, it is believed that Fluor Enterprises, Inc. was doing business as FDCI and was transacting business in South Carolina and the Territory of Puerto Rico by virtue of a contractual relationship with the United States Army Corps of Engineers ("USACE").

4. Upon information and belief, Defendant, Fluor Enterprises, Inc. ("FEI") is a foreign corporation organized and existing under the laws of the State of California and is registered to transact business in South Carolina. At all times herein, it is believed that FEI is the parent corporation of FDCI and FEI exercises ownership, management, and/or control over the operations of FDCI.

5. At all times herein, other than the Fluor agents, employees, and/or representatives located in Puerto Rico, the Fluor's agents, employees, and/or representatives responsible for contracting and contract administration regarding the matters subject of this litigation are all located in Fluor's Greenville, South Carolina office.

6. Fluor consists of a global amalgamation of corporate entities/subsidiaries in the business of providing engineering, procurement, fabrication, construction, maintenance related services on domestic and foreign construction projects.

7. Zurich American Insurance Company ("Zurich") is a foreign incorporated entity organized and existing pursuant to the laws of the State of New York. Zurich can be located for service of process at 1400 American Lane, Schaumburg, IL 60196. At all times herein, it is believed that Zurich served as a surety to and issued payment bond(s) on behalf of Fluor for the project that is the subject of this lawsuit pursuant to the Miller Act, 40 U.S.C. § 3131 et seq.

8. Federal Insurance Company ("Federal") is a foreign incorporated entity organized and existing pursuant to the laws of the State of Indiana. Federal can be located for service of

process at 202B Hall's Mill Road, Whitehouse Station, NJ 08889. At all times herein, it is believed that Federal served as a surety to and issued payment bond(s) on behalf of Fluor for the project that is the subject of this lawsuit pursuant to the Miller Act, 40 U.S.C. § 3131 et seq.

9. Travelers Casualty and Surety Company ("Travelers") is a foreign incorporated entity organized and existing pursuant to the laws of the State of Connecticut. Travelers can be located for service of process at One Tower Square, Hartford, CT 06183. At all times herein, it is believed that Travelers served as a surety to and issued payment bond(s) on behalf of Fluor for the project that is the subject of this lawsuit pursuant to the Miller Act, 40 U.S.C. § 3131 et seq.

10. Fidelity and Deposit Company of Maryland ("Fidelity") is a foreign incorporated entity organized and existing pursuant to the laws of the State of Maryland. Fidelity can be located for service of process at 1299 Zurich Way, 5th Floor, Schaumberg, IL 60196. At all times herein, it is believed that Fidelity served as a surety to and issued payment bond(s) on behalf of Fluor for the project that is the subject of this lawsuit pursuant to the Miller Act, 40 U.S.C. § 3131 et seq.

11. Liberty Mutual Insurance Company ("Liberty") is a foreign incorporated entity organized and existing pursuant to the laws of the State of Massachusetts. Federal can be located for service of process at 175 Berkley Street, Boston, MA 02116. At all times herein, it is believed that Liberty served as a surety to and issued payment bond(s) on behalf of Fluor for the project that is the subject of this lawsuit pursuant to the Miller Act, 40 U.S.C. § 3131 et seq.

12. This Court has jurisdiction over the parties and subject matter of this action pursuant to 28 U.S. C. § 1331 et seq.

13. Venue is proper in this Court pursuant to the Miller Act (40 U.S.C. §3131 et seq.); the project which is the subject of this action was funded by federal monies and was performed and arose out of federal disaster relief efforts in the Territory of Puerto Rico.

**FACTUAL BACKGROUND**

14. In September 2017, Hurricane Irma, a Category 5 storm, passed north of the United States Territory of Puerto Rico ("Puerto Rico") leaving much of Puerto Rico without power. Approximately 14 days later, Hurricane Maria made direct landfall on Puerto Rico as a powerful Category 4 hurricane, leaving nearly all Puerto Rican residents without power and the Puerto Rican electric utility infrastructure in disrepair. Hurricane Irma and Maria are herein collectively referred to as the "Storms".

15. Upon information and belief, Puerto Rico has 2,400 miles of transmission lines and 30,000 miles of distribution lines with 300 sub-stations across the territory. It is estimated that 80 percent of the Puerto Rico Electric Power Authority ("PREPA") electric power grid (the "Power Grid") was adversely impacted by the Storms.

16. Upon information and belief, as a result of the residual effects and impacts the Storms had on the PREPA Power Grid, the Federal Emergency Management Agency ("FEMA") began directing various activities to assist Puerto Rico in disaster recovery. Accordingly, in late 2017, the United State Army Corps of Engineers ("USACE") awarded Fluor government construction contracts valued in excess of eight Hundred Thirty Million and 00/100 ($830,000,000.00) Dollars to assist in restoring electric utilities in Puerto Rico (the "USACE Contracts").

17. Pursuant to the USACE Contracts, Fluor agreed to serve as a prime contractor to USACE in support of ongoing work to restore power to the PREPA Power Grid (the "Project").

18. Upon information and belief, Fluor was one of several prime contractors tasked by USACE to dedicate substantial efforts to complete the Project.

19. Fluor entered into multiple subcontract agreements with electric utility, power distribution, and transmission service providers (the "Subcontractors") like Haliron to fulfill Fluor's obligations under the USACE Contracts.

20. Upon information and belief, after Fluor had commenced its work on the Project, Fluor received criticism related to its lack of productivity, its failure to properly execute obligations under the USACE Contracts, and its failure to adequately manage its personnel and Subcontractors on the Project.

21. Upon information and belief, in an effort make up for its lack of productivity on the Project, Fluor made the decision to increase its footprint on the Project by subcontracting for additional labor and equipment; Fluor approached Haliron for this purpose.

22. On or about January 8, 2018, FDCI and Haliron entered into a subcontract agreement (the "Contract") wherein Haliron agreed to provide electric transmission, power distribution, and associated services to the Project (the "Work"). The Contract is attached hereto and incorporated herein as **Exhibit "A"**.

23. Pursuant to the Contract, in exchange for the labor, equipment, and materials associated with Haliron's Work, Fluor agreed to pay Haliron the amount of Thirty Million Five Hundred Ninety-Seven Thousand Five Hundred Twenty-Nine and 90/100 ($30,597,529.90) Dollars.

24. Haliron notified Fluor that it intended to factor its accounts receivable. Representatives of Fluor directed or otherwise recommended a factoring company to Haliron that Fluor had previously worked with before. However, Haliron entered into a factoring agreement with LSQ Funding Group, L.C. ("LSQ").

25. Fluor was made aware of and did not raise any objection to Haliron's factoring agreement with LSQ. In fact, Fluor directly communicated with LSQ to approve applications for payment and directed LSQ to fund payment to Haliron for one or more Project invoices.

26. In an effort to fulfill the terms of the Contract and under significant time constraints, Haliron contracted with multiple lower-tier subcontractors for additional labor and equipment support for use on the Project.

27. Subsequent to the Parties entering into the Contract, Fluor directed Haliron to begin efforts to mobilize its forces and equipment on the Project (the "Mobilization").

28. Pursuant to the Contract, and at no cost to Haliron, Fluor was responsible for furnishing mobilization services to and from Puerto Rico, including shipment of Haliron's equipment and transportation/travel of Subcontractor personnel.

29. Haliron and its subcontractors (collectively hereinafter as "Haliron") began efforts to mobilize in accordance with Fluor's requests and directives. The Mobilization process for Haliron required the consolidation, movement, and reconsolidation of three (3) groups of movement collectively consisting of approximately two hundred sixty-three (263) pieces of equipment and three hundred fifty-one (351) laborers.

30. Haliron's laborers and equipment traveled across various states to multiple ports along the coast of Florida (the "Florida Ports") for deployment to Puerto Rico.

31. Upon the arrival of Haliron's laborers and equipment at the Florida Ports, Haliron prepared its equipment for overseas shipment and its laborers for air transportation as arranged, controlled, tracked, and paid for by Fluor.

32. Upon arrival of Haliron's laborers to Puerto Rico, Fluor failed to adequately furnish temporary housing and/or meals for Haliron's laborers. Accordingly, and as provided by the

Contract, Haliron invoiced Fluor for per diem costs associated with Haliron's laborers furnishing themselves with items needed for basic life support (i.e. temporary housing and meals).

33. The temporary housing made available by Fluor was substantially inadequate such that Flour only provided the shell of an abandoned structure that did not have any power or other basic utilities needed for life support.

34. Upon arrival of Haliron's laborers to Puerto Rico, Haliron was unable to take possession of all of its equipment due to weather events causing delays in Fluor's shipment of Haliron's equipment to the Territory of Puerto Rico (the "Equipment Shipping Delays").

35. As a result of the Equipment Shipping Delays, Haliron's ability to carry out its full scope of Work on the Project was initially limited. However, Haliron remained proactive and carried out various tasks in furtherance of its obligations and responsibilities under the Contract like:

a.) Performing reconnaissance of areas of Puerto Rico where Fluor would assign Haliron;

b.) Developing plans and/or courses of action for accomplishing known tasks;

c.) Preparing lists of materials and supplies Haliron and its subcontractors would need to execute the Work;

d.) Receiving equipment and preparing the same for deployment to locations throughout Puerto Rico in support of its Work; and

e.) Conducting training of personnel and equipment;

36. As Haliron became established on the Project and as its personnel and equipment continued to arrive to Puerto Rico, Haliron began performing the Work contemplated in the Contract.

37. Upon information and belief, Haliron became aware of its daily Work tasks by Fluor issuing work orders ("Work Orders") which were to coincide with the Project "Plan of the Day".

38. Upon information and belief, the Work Orders issued by Fluor were used by Fluor as a means of validating payments and reimbursements to its Subcontractors like Haliron.

39. Upon information and belief, on multiple occasions Fluor failed to issue Work Order numbers to Haliron, yet required Haliron's employees and subcontractors to deploy personnel and equipment to various areas of the Territory of Puerto Rico and perform work; this hindered Haliron's ability to dedicate its forces for maximum efficiency.

40. In the event Fluor failed to issue Haliron Work Orders, Haliron would communicate with Fluor representatives to request that Fluor issue Haliron Work Orders that coincide with the Project "Plan of the Day".

41. On multiple occasions, Fluor ignored and/or otherwise disregarded Haliron's requests for Work Orders, thereby leaving Haliron with no options but to continue carrying out the Work of the prior day.

42. Due to Fluor's systemic failure to issue Work Orders to Haliron and considering the invoicing requirements set forth in the Contract, Haliron experienced multiple instances where Fluor retroactively directed and/or otherwise re-assigned Work Orders to Haliron's invoicing that did not coincide with the Project "Plan of the Day" or the Work actually performed by Haliron during those periods invoiced.

43. Upon information and belief, Fluor retroactively directed or assigned inaccurate and/or improper Work Orders to Haliron for the purpose of increasing the likelihood of reimbursement from USACE.

44. On one or more instances, duly authorized employees, agents, and/or representatives of Fluor requested that Haliron increase its manpower and equipment for the purpose of performing additional scopes of Work on the Project.

45. In accordance with Fluor's requests, Haliron accommodated Fluor by increasing its labor and equipment forces by subcontracting with entities that were concluding work under direct contracts with Fluor;

46. Haliron's Work, like the services provided by other Subcontractors to Fluor on the Project, were requested, used, and accepted by Fluor for the purpose of fulfilling Fluor's obligations under the USACE Contracts.

47. Haliron has submitted invoices and associated documents to Fluor and has requested payment for the Work performed by Haliron on the Project.

48. On one or more occasions, Fluor arbitrarily and summarily denied payment to Haliron, claiming that Haliron's invoices and requests for payment submittals were not properly formatted.

49. Haliron repeatedly requested that Fluor provide Haliron examples and/or samples of what Fluor would consider properly formatted invoices and/or applications for payment on the Project.

50. Even though Haliron repeatedly made these reasonable requests, Fluor unreasonably failed and or refused to provide Haliron with anything other than ambiguous directives, devoid of any meaningful examples or instructions, to resubmit its invoices and requests for payment.

51. Fluor has received multiple notices from Haliron regarding Fluor's failure to remit payment to Haliron in a timely manner. In addition to verbal communications and e-mails

requesting payment, Haliron furnished formal demands for payment to Fluor. Haliron's formal demands for payment are attached hereto and incorporated herein as **Exhibit "B"**.

52. On or about June 22, 2018 Fluor released a partial payment to Haliron in the amount of Three Million Five Hundred Sixty Thousand Three Hundred Two and 79/100 ($3,560,302.79) Dollars; this partial payment instilled some hope in Haliron that the parties would be able to reconcile their disputes. Accordingly, Haliron issued notice to Fluor to rescind (the "Notice to Rescind") its demand letter as a good faith effort to continue efforts in resolving the disputes existing between the parties.

53. Since the issuance of the Notice to Rescind, Fluor made representations that Haliron's invoices and requests for payment would be processed for pay on or about August 10, 2018. However, Fluor failed to make any payments to Haliron on or about August 10, 2018 Accordingly, Haliron issued another written demand for payment on August 20, 2018. *See* **Exhibit "B"**.

54. Fluor continued to unreasonably fail or refuse to remit any further payments to Haliron until the filing of Haliron's original Complaint. Thereafter, Fluor has released and/or otherwise remitted a partial payment to Haliron for its services on the Project in the amount of Four Million Four Hundred Twenty-Two Thousand Eight Hundred Fifty-Eight and 15/100 ($4,422,858.15) Dollars in January 2019.

55. Although Fluor has remitted and/or released partial payments to Haliron, Fluor has failed to properly remit all payments to Haliron in accordance with the Contract and the invoices or applications for payment Haliron has submitted to Fluor.

56. Fluor has wrongfully failed and/or unreasonably refused to pay Haliron the amount of at least Five Million Sixty-Four Thousand Five Hundred Ninety-Two and 99/100 ($5,064,592.99) Dollars.

57. Fluor has failed to comply with the terms of the Contract and has otherwise mislead or has acted in bad faith towards Haliron by failing to properly remit payments to Haliron as requested in Haliron's Project invoices.

58. Haliron has acted in good faith towards Fluor and has made multiple attempts to reconcile any disputes related to Haliron's Project invoices. Nonetheless, Fluor has wrongfully withheld payments from Haliron since Haliron's demobilization from the Project.

59. That as a result of Fluor's acts and/or omissions, Haliron has expended and will continue to expend significant sums of money to mitigate the damages caused by Fluor.

60. In addition to Fluor's wrongful and unreasonable failure to remit full payment to Haliron for its services on the Project, Haliron incurred and experienced interest charges, significant cash flow restraints, and residual impacts from Fluor approving of one or more of Haliron's invoices for payment, directing LSQ to fund such invoices, and Fluor subsequently failing to remit payment for the invoices to LSQ.

61. That Fluor's wrongful failure to remit payments in accordance with the Contract and Haliron's invoices, Fluor has caused irreparable damage to Haliron's business and reputation.

**FOR A FIRST CAUSE OF ACTION**
***(BREACH OF CONTRACT)***

62. Haliron hereby realleges all allegations set forth above, not inconsistent herewith, as if fully restated verbatim herein.

63. As described herein, On or about January 8, 2018, FDCI and Haliron entered into a subcontract agreement (the "Contract") wherein Haliron agreed to provide electric transmission, power distribution, and associated services to the Project (the "Work"). *See* **Exhibit "A"**.

64. Upon Information and belief, Haliron and other Subcontractors to Fluor have been directed to perform Work on the Project; such Work was requested, used, and accepted by Fluor.

65. Fluor acknowledged and agreed to pay Haliron for its Work on the Project. However, as of the date of this Complaint, Fluor has failed to comply with the terms of Contract and has failed to remit timely payment to Haliron.

66. Haliron would respectfully allege and show that it was qualified to perform the Work contemplated in the Contract and, in fact, did perform the Work as contemplated in the Contract or as otherwise requested and/or directed by Fluor.

67. Haliron has complied with the terms of the Contract and has fully satisfied its obligations and responsibilities thereunder.

68. Haliron would respectfully allege and show that, notwithstanding its faithful performance of its obligations under the aforesaid Contract, Fluor breached the terms and conditions of the Contract by failing to properly pay Haliron for its performance of Work and by breaching the implied covenants and fair dealing of the Contract.

69. As of the date of this Amended Complaint, the amount of at least Five Million Sixty-Four Thousand Five Hundred Ninety-Two and 99/100 ($5,064,592.99) Dollars associated with Haliron's Work on the Project, remains due and owing to Haliron from Fluor.

70. As a result of the Fluor's breaches of Contract, Haliron is entitled to a judgment against the Fluor for actual, consequential, and punitive damages for which it hereby sues together with reasonable attorneys' fees and the costs of this action, in amounts to be determined at trial.

**FOR A SECOND CAUSE OF ACTION**
***(QUANTUM MERUIT)***

71. Haliron alleges its Second Cause of Action as an alternative to its First Cause of Action, and Haliron hereby realleges all allegations set forth above, not inconsistent herewith, as if fully restated verbatim herein.

72. Haliron provided electric transmission, power distribution, and associated services to the Project (the "Work") for the benefit of Fluor.

73. Haliron's Work on the Project was accepted, used, and enjoyed by Fluor.

74. At the time of Haliron performing Work on the Project, it was understood by Fluor that Haliron was to be paid for its Work; Fluor specifically requested the Work performed by Haliron on the Project.

75. Specifically, while on the island of Puerto Rico, Fluor requested that Haliron perform work as contemplated in the Contract, increase its labor and equipment forces, and perform work beyond that which was contemplated in the Contract; at all times, Haliron accommodated Fluor's requests.

76. The acceptance of the Haliron's Work by Fluor created an implied agreement between Haliron and Fluor.

77. Haliron's Work was furnished under such circumstances that it was clear that Haliron expected to be paid for the labor and equipment it furnished to the Project; Fluor will be unjustly enriched if Haliron is not paid for the labor and equipment furnished by and/or on behalf of Haliron to Fluor.

78. The reasonable market value of the labor and equipment furnished is at least Five Million Sixty-Four Thousand Five Hundred Ninety-Two and 99/100 ($5,064,592.99) Dollars, for

which Haliron hereby sues in quantum meruit or other equitable theory for the reasonable value of the materials and labor supplied.

**FOR A THIRD CAUSE OF ACTION**
**(*CLAIM ON PAYMENT BOND; MILLER ACT CLAIM*)**

79. Haliron hereby realleges all allegations set forth above, not inconsistent herewith, as if fully restated verbatim herein.

80. Haliron brings this cause of action pursuant to and in accordance with the Miller Act, 40 U.S.C. § 3131 et seq (the "Miller Act").

81. Upon information and belief, Fluor entered into multiple contracts with the United States of America ("Government") by and through USACE to serve as a prime contractor to USACE in support of ongoing work to restore power to the PREPA Power Grid (the "Project") in Puerto Rico.

82. The Project was initiated as a result of the residual effects and impacts that severe storms had on the Territory of Puerto Rico and was in connection with the Federal Emergency Management Association's ("FEMA") disaster relief and recovery efforts; the Project was clearly contracted or otherwise initiated for public benefit.

83. Upon information and belief, as required by the USACE Contracts and as otherwise required by the Miller Act, Fluor, as the principal and Zurich, Federal, Travelers, Fidelity, and Liberty, as the sureties (collectively the "Sureties"), executed one or more payment bond(s) (collectively the "Bond(s)") for the purpose of guaranteeing payment to Fluor's Subcontractors, including Haliron. True and correct copies of the Bond(s) are attached hereto and incorporated herein as **Exhibit "C"**.

84. The Bond(s) guaranteed payment for all persons/entities furnishing labor, materials, and/or equipment to and/or on behalf of Fluor on the Project.

85. Haliron requested copies of such Bond(s) prior to initiating this action, however, Fluor failed to provide Haliron with a copy of any of the Bond(s) prior to filing Haliron's original Complaint.

86. Flour finally produced copies of the Bond(s) to Haliron on or about October 26, 2018.

87. In furtherance of Fluor's obligations and responsibilities under the USACE Contracts, Fluor entered into the Contract with Haliron and Haliron entered into multiple subcontract agreements to assist in fulfilling its obligations under the Contract.

88. Haliron and its subcontractors furnished significant amounts of labor and equipment to Fluor on the Project; payment remains due and owing to Haliron and its subcontractors for their Work on the Project; Fluor has defaulted on the Contract and on the payment obligations Fluor owes to Haliron for the labor and materials Haliron and its subcontractors furnished to the Project.

89. As of the date of this Complaint, the amount of at least Five Million Sixty-Four Thousand Five Hundred Ninety-Two and 99/100 ($5,064,592.99) Dollars remains due and owing to Haliron from Fluor; the amount remaining due and owing to Haliron by Fluor includes the costs associated with Haliron's subcontractors furnishing labor and equipment on the Project.

90. On or about June 22, 2018 and again on August 20, 2018, Haliron demanded Fluor to place its surety on notice of Haliron's claims for payment. Additionally, Haliron demanded that Fluor provide Haliron copies of the Bond(s). *See* **Exhibit "B"**.

91. Haliron delivered the demands in a manner that provided written verification of delivery as required by applicable law.

92. Since the filing of Haliron's original Complaint, Fluor has provided Haliron with copies of the Bond(s). *See* **Exhibit "C"**.

93. A period less than one (1) year has lapsed since these dates, and Haliron has not been paid in full for services furnished on the Project.

94. Haliron has completed its Work on the Project and all conditions precedent for the bringing and maintaining this action have been performed or have occurred.

95. Fluor has failed to pay Haliron the amount of at least Five Million Sixty-Four Thousand Five Hundred Ninety-Two and 99/100 ($5,064,592.99) Dollars for electric transmission, power distribution, and associated services on the Project.

96. Fluor as the Bond(s)' principle and the Sureties owe Haliron the principal amount of Five Million Sixty-Four Thousand Five Hundred Ninety-Two and 99/100 ($5,064,592.99) Dollars pursuant to the Bond(s) and in accordance with applicable state and federal laws, including the Miller Act.

97. Haliron is entitled to recover its attorneys' fees and expenses from Fluor and/or Fluor's Sureties for prosecuting this action pursuant to the principles of equity. Furthermore, upon sufficient information and belief, Haliron is entitled to recover attorneys' fees and expenses from Fluor and/or Fluor's Sureties because they have acted in bad faith, vexatiously, wantonly and/or willfully in failing to pay Haliron in a timely manner and failing to adequately respond to Haliron's demands.

**FOR A FOURTH CAUSE OF ACTION**
**(S.C. Code of Laws Annotated §27-1-15)**

98. Haliron hereby realleges all allegations set forth above, not inconsistent herewith, as if fully restated verbatim herein.

99. Pursuant to S.C. Code Ann. §27-1-15, Haliron sent written demands for payment (the "Demand Letters") via certified mail on June 22, 2018 and August 20, 2018. *See* **Exhibit "B"**.

100. The Demand Letters required Fluor to perform a reasonable investigation and pay all undisputed amounts to Haliron within forty-five (45) days from the date of the Demand Letters.

101. On or about June 22, 2018 Fluor released a partial payment to Haliron; this partial payment instilled some hope in Haliron that the parties would be able to reconcile their disputes. Accordingly, Haliron issued notice to Fluor to rescind (the "Notice to Rescind") the June 22, 2018 Demand Letter as a good faith effort to continue efforts in resolving the disputes existing between the parties.

102. Since the issuance of the Notice to Rescind, Fluor made representations that Haliron's invoices would be processed for pay on or about August 10, 2018. However, Fluor failed to make any payments to Haliron on or about August 10, 2018 Accordingly, Haliron issued the August 20, 2018 Demand Letter to Fluor.

103. Since the issuance of the August 20, 2018 Demand Letter by Haliron, on or about January 10, 2018, Flour issued, paid, and/or otherwise remitted a partial payment to Haliron in the amount of Four Million Four Hundred Twenty-Two Thousand Eight Hundred Fifty-Eight and 15/100 ($4,422,858.15) Dollars. However, Fluor has continued to wrongfully and/or unreasonably withhold payments that are rightfully due and owing to Haliron for the services rendered on the Project.

104. To date, Fluor has failed to pay Haliron the amount of at least Five Million Sixty-Four Thousand Five Hundred Ninety-Two and 99/100 ($5,064,592.99) Dollars (inclusive of costs associated with the services of Haliron's subcontractors) for electric transmission, power distribution, and associated services on the Project.

105. Upon information and belief, Fluor has failed to perform a reasonable investigation of the amounts owed or to pay undisputed amounts to Haliron. Accordingly, pursuant to S.C. Code Ann. § 27-1-15, Fluor is liable to Haliron for attorneys' fees and interest from the date of the Demand Letters.

**WHEREFORE**, Plaintiff, Haliron Power, LLC prays for relief as follows:

1. For judgment against the Defendant, Fluor Daniel Caribbean, Inc., a subsidiary of Fluor Enterprises, Inc., in the amount of at least Five Million Sixty-Four Thousand Five Hundred Ninety-Two and 99/100 ($5,064,592.99) Dollars;
2. For judgment against the Defendants, Zurich American Insurance Company, Federal Insurance Company, Travelers Casualty and Surety Company, Fidelity and Deposit Company of Maryland, and, Liberty Mutual Insurance Company, jointly and severally, in the amount of at least Five Million Sixty-Four Thousand Five Hundred Ninety-Two and 99/100 ($5,064,592.99) Dollars;
3. For actual, consequential, and punitive damages;
4. For interest, costs, and attorneys' fees; and
5. For such other and further relief as the Court may deem just and proper.

*[SIGNATURE PAGE FOLLOWS]*

Respectfully submitted,

s/Thomas E. Dudley, III
Thomas E. Dudley, III (Fed. Bar # 05973)
Mark A. Bible, Jr. (Fed. Bar #12307)
KENISON, DUDLEY & CRAWFORD, LLC
704 East McBee Avenue
Greenville, SC 29601
Ph. 864.242.4899
Fax 864.242.4844
dudley@conlaw.com
bible@conlaw.com
*Attorneys for Plaintiff*

January 22, 2019